UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER                                    Case No.
OF MICHIGAN HERITAGE BANK,
                                                           Hon.
        Plaintiff,

v.

TIMOTHY J. CUTTLE,

        Defendant.

---

## COMPLAINT AND JURY DEMAND

Plaintiff, the Federal Deposit Insurance Corporation as Receiver of Michigan Heritage

Bank, Farmington Hills, Michigan ("FDIC-R"), for its Complaint, states as follows:

I.   **INTRODUCTION**

        1.      The Federal Deposit Insurance Corporation ("FDIC") brings this case in its

capacity as Receiver of Michigan Heritage Bank ("MHB" or the "Bank") pursuant to authority

granted by 12 U.S.C. § 1821.  The FDIC-R seeks to recover losses in excess of $8.2 million that

Defendant Timothy J. Cuttle ("Cuttle"), a former MHB loan officer, caused the Bank to incur.

Among other things, Cuttle failed to conduct adequate due diligence and analysis prior to

originating and recommending approval of 11 commercial loans that resulted in losses to the

Bank, recommended the approval of those loans in violation of the Bank's lending policy

("Lending Policy") and prudent lending practices, failed to adequately inform MHB's Board of

Directors ("Board") and senior management of deficiencies with respect to those loans, and

caused the Bank to fund loans even though borrowers had failed to satisfy prefunding conditions. Cuttle is liable for the losses that the Bank suffered as a result of his negligence, gross negligence, and breach of fiduciary duty.

## II.    PARTIES

2.    Plaintiff is the FDIC in its capacity as Receiver of MHB, pursuant to 12 U.S.C. § 1811, *et seq*.  On April 24, 2009, the Bank was closed by the Commissioner of the Michigan Office of Financial and Insurance Regulation and the FDIC was appointed as Receiver.

3.    Defendant Timothy J. Cuttle is a former loan officer of the Bank.  He held the position of Senior Commercial Lender from May 16, 2005, to February 16, 2006, when he was promoted to interim Senior Loan Officer, Chairman of MHB's Senior Loan Committee ("SLC"), and Chairman of MHB's Commercial Loan Committee.  During his tenure as Senior Loan Officer, Cuttle supervised six loan officers and continued to originate and work on his own loan files.  Cuttle remained MHB's Senior Loan Officer until May 24, 2007, when he was demoted to Northeast Regional Vice President and was removed from the SLC.  His employment with the Bank concluded on June 20, 2008.  Cuttle resides in Washington Township, Michigan.

## III.    JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction for this action pursuant to 12 U.S.C. § 1811 *et seq*., 12 U.S.C. § 1819(b)(1) and (2), and 28 U.S.C. §§ 1331 and 1345.  The FDIC is a corporation organized and existing under the laws of the United States of America, and brings this action in its receivership capacity.  Actions to which the FDIC is a party are deemed to arise under the laws of the United States.  The FDIC, including in its capacity as Receiver, has the authority to sue and complain in any court of law, and is empowered to pursue claims held by the Bank, including its claims against the Defendant.  12 U.S.C. § 1819.

5.      This Court has personal jurisdiction over Cuttle, who at all relevant times was a resident of, and conducted business in, the State of Michigan.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because all or substantially all of the acts charged herein occurred in this district and the FDIC-R's claims arose in this district.

## IV.    FACTUAL BACKGROUND

7.      MHB was founded in 1997 in Farmington Hills, Michigan, and had two additional branch offices located in Novi and Wixom, Michigan.  In its early years of operation, MHB focused its lending business on equipment finance leasing.  In 2004, MHB shifted its lending focus to place a greater emphasis on commercial lending.  As part of the strategy to support this change, MHB hired several new officers, including Cuttle.  Prior to joining MHB, Cuttle had worked in the banking industry for approximately 25 years and had developed extensive commercial lending experience.  Among other things, Cuttle had served briefly as the Chief Executive Officer ("CEO") of New Century Bank of Shelby Township, Michigan, just prior to its failure on March 28, 2002, and as the CEO and President of Macomb Community Bank of Clinton Township, Michigan.

### A.    MHB's Lending Policy

8.      In order to promote safe and sound practices for MHB's new focus on commercial lending, on December 15, 2005, MHB's Board adopted a formal, detailed, and written Lending Policy.  The Lending Policy expressly recognized that commercial lending was the Bank's primary source of revenue and, therefore, MHB's loan officers were to follow the Loan Policy with the "utmost discretion."

9.      Under the Lending Policy, a loan officer was responsible for, among other duties, evaluating a proposed loan and assigning it an initial "risk rating."  In order to accomplish these tasks, the loan officer was required to collect relevant financial and other information from the applicant and third parties (including, but not limited to, appraisers and accountants), analyze the applicant's ability to repay the proposed loan (including, but not limited to, information regarding the applicant's capitalization, liquidity, cash flow, revenue, management strength, and credit history), and evaluate whether the proposed collateral and security were sufficient to protect MHB's interest in the loan.  Current financial statements were required for all commercial loans.  Audited financial statements were required for all loans to one borrower totaling more than $1 million.

10.      MHB's Lending Policy also identified criteria that were required to be evaluated and standards that were required to be met in order for a loan officer to secure approval of a loan without obtaining an exception to the Lending Policy.  This included the Lending Policy's commercial loan-to-value ("LTV") ratio guidelines, which established a maximum ratio between the amount of a commercial real estate ("CRE") loan and the value of the collateral securing that loan.  The maximum LTV ratio for a given loan depended upon the type of collateral securing the loan.  For example, the Lending Policy established 65 percent as the maximum LTV ratio for a CRE loan to be secured by raw land as collateral.  The purpose of these guidelines was to ensure that the Bank would be adequately secured in the event that a borrower defaulted on a loan.  Thus, the LTV was one of the key risk factors that MHB's loan officers were required to assess when qualifying applicants for a loan.

11.      MHB's loan officers were also required to evaluate applicants' abilities to repay their proposed loans based on, among other criteria, the applicants' debt service coverage ratios

4

("DSCRs").  In the context of commercial lending, DSCR is the ratio of (i) cash available from a borrower's operations to service the borrower's debts to (ii) the borrower's interest, principal and lease payment obligations.  DSCR is a benchmark that MHB used in measuring an applicant's ability to produce enough cash to cover its debt payments.  The Lending Policy set an underwriting guideline that a CRE borrower have a DSCR of 1.25 or higher in order to qualify for a loan from MHB.

12.     The Lending Policy also required MHB's loan officers to closely examine the recourse and collateral for a proposed loan.  The Lending Policy identified personal guaranties of transaction principals as an "essential recourse requirement."  If an applicant's individual net worth was inadequate to secure the loan, the loan officer was required to consider the addition of a second guarantor.  For every guaranty, the loan officer was required to review the nature and allocation of the proposed guarantor's individually and jointly owned assets, direct and contingent liabilities, and income sources.

13.     For most commercial loans, the Lending Policy also required the loan officer to obtain a certified appraisal of any real property pledged as collateral and to review that appraisal for thoroughness and accuracy of valuation.  The Bank maintained a list of appraisers who were approved to provide such appraisal services.

14.     The Lending Policy also classified certain types of loans as "undesirable." Undesirable loans included loans to enterprises engaged in environmentally sensitive processes, such as gas stations, and loans where the sources and timing of repayment were undefined, both of which the Lending Policy provided should not be made under normal circumstances. Undesirable loans also included loans to applicants who lacked integrity and honesty, which the

6980946.2 04649/136704

Lending Policy provided could not be made under any circumstances, with no exceptions permitted.

15.     If a loan officer intended to recommend a loan for approval, the Lending Policy mandated that the loan officer prepare a "Loan Presentation" form for review by the directors and officers who had the authority to approve the loan.  The Loan Presentation form was structured to provide essential information regarding the proposed loan, including the recommended risk rating, purpose of the loan, repayment terms, financial profile of the borrower, description and value of the proposed collateral, and any pre-funding conditions.  The directors and officers relied on the information provided in the Loan Presentation in considering whether to approve a loan.  Although an MHB credit analyst could assist the loan officer in compiling this information, under the Bank's Lending Policy, the loan officer bore the ultimate responsibility for ensuring that the Loan Presentation was accurate and complete.

16.     Pursuant to the Lending Policy, SLC approval was required for loans from $750,000 to $2 million, and Board approval was required for loans in excess of $2 million.  In practice, even loans under $2 million were, on occasion, reviewed and approved by the Board.  For loans exceeding $750,000, in addition to preparing a written Loan Presentation, the loan officer was typically required to provide an oral presentation regarding the recommendation to approve the proposed loan to the SLC or, in some cases, the full Board.

17.     Once a loan was approved, the loan officer prepared and sent a letter of intent to the borrower setting forth the terms of the loan and the conditions that the borrower was required to satisfy before MHB would close and fund the loan.  The Lending Policy required the loan officer to obtain approval for any deviations from the approved pre-funding conditions before closing the loan and disbursing any funds.

6980946.2 04649/136704

B.     **Cuttle's Negligent and Grossly Negligent Acts**

18.     Throughout his tenure at MHB, Cuttle routinely ignored the Bank's Lending Policy and prudent lending practices in originating loans and recommending them for approval, including failing to ensure that his Loan Presentations included complete and accurate information.

19.     Between June 2005 and October 2007, Cuttle caused the Bank to approve and fund loans that would have been rejected had Cuttle complied with MHB's Lending Policy, followed prudent lending practices, and conducted adequate due diligence, including undertaking basic loan review procedures.  These and other acts by Cuttle caused the Bank to incur losses in excess of $8.2 million, including the losses described below.

            *Redwood*

20.     In or about June 2005, Cuttle originated and recommended the approval of a $1.9 million loan to Redwood Development, LLC ("Redwood").  Cuttle's Loan Presentation to MHB's Board and SLC provided that the purpose of the loan was to provide financing for the borrower's construction of a condominium development.  The primary repayment source was to be Redwood's anticipated cash flow from the sale of completed condominiums.  The loan was secured by a first mortgage on another 20-unit condominium project and two unlimited personal guarantees by the owners of Redwood.  Based on Cuttle's recommendation, the Board approved the loan to Redwood on or about June 16, 2005.

21.     After the loan to Redwood was approved but before MHB funded that loan, Cuttle requested and recommended an exception to the loan terms to omit one of the guarantors on the basis that his guaranty was immaterial to the over-all transaction.  On or about October 13, 2005, based on Cuttle's representations, the SLC granted his request for an exception to fund the loan without a guaranty by the creditworthy guarantor.  However, Cuttle had failed to conduct

adequate due diligence and credit analysis prior to making that recommendation.  Among other things, Cuttle had failed to obtain audited financial statements from the remaining guarantor, even though the loan was in excess of $1 million, failed to adequately analyze the remaining guarantor's net worth and instead relied only on Cuttle's prior relationship with him, and failed to analyze the credit considerations pertaining to the actual value of the remaining guarantee. Contrary to Cuttle's representation, the remaining guaranty was inadequate to support the loan due to that guarantor's poor creditworthiness.  In contrast, the released guarantor had strong creditworthiness and, thus, that additional and much stronger guaranty was necessary to protect the Bank from a default by the borrower.  Cuttle would have discovered these facts if he had performed adequate due diligence.  Cuttle's acts and omissions violated the Bank's Lending Policy and prudent, safe, and sound lending practices.

22.     On or about October 17, 2007, Redwood defaulted on the loan.  As a result of Cuttle's actions and inactions with respect to this loan, MHB incurred approximately $1.76 million in losses.  Had Cuttle performed adequate due diligence and provided a complete and accurate Loan Presentation, MHB would not have made the loan to Redwood and incurred the resulting losses.

### Shelby

23.     In or about March 2006, Cuttle originated and recommended the approval of a $2 million participation in an existing $8.2 million loan to Shelby City Place, LLC ("Shelby") by another lender.  Cuttle's Loan Presentation to the SLC stated that the primary source of repayment of the loan would be the borrower's cash flow.  The loan was secured by a first mortgage on 54 acres of vacant land located in Shelby Township, Michigan, and a personal guaranty by the owner of Shelby.

8

24.     In his Loan Presentation, Cuttle improperly failed to disclose to the SLC that the total loan to Shelby was actually for $8.7 million, rather than for $8.2 million.  Among other things, Cuttle also failed to perform an independent and current analysis of the borrower's and the guarantor's financial creditworthiness.  As a result of all of these failures, Cuttle's Loan Presentation did not provide an appropriate risk rating that took into account the borrower's insufficient cash flow, negative net income for the past two years, negative net worth, and history of late payments.  Cuttle's acts and omissions with respect to the Shelby loan violated MHB's Lending Policy and prudent, safe, and sound lending practices.  Based on Cuttle's Loan Presentation and recommendation, the SLC approved the loan to Shelby, which MHB then funded on or about March 29, 2006.

25.     On or about August 1, 2007, Shelby defaulted on the loan.  As a result of Cuttle's actions and inactions with respect to this loan, the Bank incurred approximately $1.76 million in losses.  Had Cuttle performed adequate due diligence and provided a complete and accurate Loan Presentation, MHB would not have made the loan to Shelby and incurred the resulting losses.

### B&E

26.     In or about July 2006, Cuttle originated and recommended the approval of an $880,000 loan to B&E Royal Oak Investments, LLC ("B&E").  Cuttle's Loan Presentation to the SLC stated that the purpose of the loan was to finance construction on the property.  Cuttle further represented in the Loan Presentation that the primary source of repayment of the loan would be the borrower's cash flow and that the loan would be secured by a first mortgage on the property.

9

27.     In originating and recommending the approval of this loan to B&E, Cuttle

violated the Lending Policy by relying solely on the borrower's unverified representations

regarding the cost of developing the property pledged as collateral for the loan.  The appraisal of

the property stated that, as of June 1, 2006, the "as-is" market value of the property was

$1 million.  The appraisal also indicated that the analysis of the property and its existing

improvements were based on the appraiser's inspection of the property and information provided

by the "client, city assessor's office and the owner."  The appraisal described the building on the

property as being "at the end of its useful life" and stated that it "should be demolished, which

the purchaser intends to do."  No development costs were reported in the appraisal or factored

into the appraised "as-is" value of $1 million.  The valuation reflected in the appraisal resulted in

an LTV ratio for the loan of 88 percent, which exceeded the maximum LTV ratio of 85 percent

for such loans under the Lending Policy.  In preparing his Loan Presentation, Cuttle added

$170,000 of unverified "development costs" to the market value of the property, even though he

knew that the appraisal of the property did not include an assessment of any development costs,

the owner of the property intended to demolish the building, and the borrower's financial

statements did not provide for development costs.  Adding $170,000 in unverified, anticipated

development costs to the purported value of the property reduced the LTV ratio for the loan to

75 percent, which was within the 85 percent limit established by MHB's Lending Policy.

28.     As a result of Cuttle's conduct, the value of the collateral presented to the SLC

was inflated, causing the LTV ratio for the loan to appear as if it fell within the limits established

by MHB's Lending Policy.  When the development costs were not included in valuing the

property, the LTV ratio for the loan exceeded the limit established by MHB's Lending Policy.

Cuttle further violated the Lending Policy by, among other things:  (1) failing to make an

independent assessment of the purported additional development costs, and (2) failing to request an exception from MHB's LTV ratio requirements when he presented and recommended approval of the loan. Based on Cuttle's Loan Presentation and recommendation, the SLC approved the loan to B&E, which MHB then funded on or about July 13, 2006.

29.     On or about December 31, 2008, B&E defaulted on the loan. As a result of Cuttle's actions and inactions with respect to this loan, the Bank incurred approximately $700,000 in losses. Had Cuttle performed adequate due diligence and provided a complete and accurate Loan Presentation, MHB would not have made this loan to B&E and incurred the resulting losses.

### *Elias and Tiffany*

30.     In or about July 2006, Cuttle also originated and recommended the approval of four loans totaling approximately $1.6 million to two jewelry stores, Elias Jewelry & Repair of Novi, Inc. and Tiffany Diamonds, Inc. (collectively, "Elias and Tiffany"). The owner of these stores was a questionable credit risk and the Board had rejected Cuttle's previous recommendation to approve these loans with only the stores' jewelry inventories as collateral. To address these concerns, the Board had instructed Cuttle to obtain valuable real property as additional collateral.

31.     When Cuttle re-submitted the loans for approval, he represented in his Loan Presentation that the loans would be secured by several properties with an appraised value of $2 million. The appraisal, however, valued the wrong property. The property owned and pledged by the borrower was a much less valuable property. Cuttle failed to conduct adequate due diligence, including basic and simple loan review practices, which would have revealed this

material error.  Relying on Cuttle's recommendation and his representations regarding the collateral, the SLC and MHB's Board approved the four loans to Elias and Tiffany.

32.     Before MHB funded the loans, Cuttle learned that other lenders had superior liens on the several properties that were pledged as collateral, which meant that MHB would be left essentially unsecured with respect to the proposed loans.  Nevertheless, Cuttle failed to inform the SLC and the Board of these facts and proceeded to close the loans despite the insufficient collateral.

33.     Cuttle also failed to use a title company in closing the loans to Elias and Tiffany. Prudent lending practices warranted the use of a title company for the loans to Elias and Tiffany because, as a condition of funding, senior liens were to be paid off on collateral property at the closings and, thus, the procurement of title insurance was warranted.  In the absence of any title company, the owner of Elias and Tiffany simply misappropriated the loan proceeds to pay off unsecured lines of credit with other lenders, rather than extinguish the senior mortgages, and then fled the country.

34.     On or about April 4, 2008, Elias and Tiffany defaulted on their loans.  As a result of Cuttle's actions and inactions with respect to these loans, the Bank incurred losses in excess of $1.3 million.  Had Cuttle performed adequate due diligence and provided a complete and accurate Loan Presentation, MHB would not have made the loans to Elias and Tiffany and incurred the resulting losses.

### Delta – Traverse City

35.     On or about January 18, 2007, Cuttle originated and recommended the approval of a $1.75 million, 90-day bridge loan to Delta Acquisitions, LLC ("Delta"), a land acquisition and development company, for the development of real estate in Traverse City, Michigan.

Cuttle's Loan Presentation to MHB's SLC and Board stated that the primary source of repayment of the loan would be the individual cash flow of Delta's principal, who was the guarantor for the loan, as well as third-party construction financing.  Prior to recommending this loan, Cuttle learned that the principal previously had been convicted of defrauding a savings and loan association.  Even though the Lending Policy prohibited the Bank from making loans to any borrower "whose integrity and honesty is questionable," Cuttle failed to disclose the conviction on his Loan Presentation form and recommended that the SLC and MHB's Board approve the loan.

36.     Cuttle also violated the Bank's Lending Policy and prudent lending practices by failing to adequately analyze the sufficiency of property pledged as collateral for this loan.  That property was a plot of vacant land that Delta's principal had represented as being improved with $1.3 million in roads and utilities.  The purported improvements nearly doubled the supposed value of the property.  In fact, the improvements did not exist.  If Cuttle had used the value of the unimproved land in his Loan Presentation, the LTV ratio for this loan would have significantly exceeded the limit established by MHB's Lending Policy and, thus, the loan could not have been approved without additional collateral.  Based on the incorrect and incomplete information that Cuttle provided in his Loan Presentation, however, the SLC and MHB's Board approved the loan.

37.     On or about October 15, 2007, shortly after MHB funded this loan, Delta defaulted.  As a result of Cuttle's actions and inactions with respect to this loan, the Bank incurred in excess of $1.47 million in losses.  Had Cuttle performed adequate due diligence and provided a complete and accurate Loan Presentation, MHB would not have made this loan to Delta and incurred the resulting losses.

6980946.2 04649/136704

*Delta – Bay Harbor*

38.     In or about March 2007, Cuttle originated and recommended the approval of a $260,000 loan to Delta for the development of real estate in Bay Harbor, Michigan.  Cuttle's Loan Presentation stated that the purpose of the loan was to retire an existing land contract and that the primary source of repayment of the loan would be the individual cash flow of Delta's principal.  The loan was secured by a first mortgage on three single family lots.

39.     As with MHB's prior loan to Delta, Cuttle failed to disclose the conviction for defrauding a savings and loan association on his Loan Presentation form and recommended the loan for approval, even though the Lending Policy prohibited the Bank from making loans to any borrower "whose integrity and honesty is questionable."

40.     Cuttle further violated the Lending Policy by failing to sufficiently analyze the creditworthiness of Delta and its principal and the reliability of the appraisals of the property pledged as collateral, which on their face provided cause for proceeding with the utmost care. For example, Delta's principal had no apparent cash equity in the lots securing the loan, his credit score was well below the Bank's minimum, and the appraisals were over-inflated on their face because one of the lots was listed for sale for a fraction of its appraised value.  Cuttle simply ignored these glaring red-flags and did not disclose them at the time of his Loan Presentation. Based on Cuttle's Loan Presentation and recommendation, MHB's Board approved this loan to Delta on March 22, 2007, and MHB then funded the loan on or about April 2, 2007.

41.     On or about August 5, 2007, shortly after MHB funded this loan, Delta defaulted. As a result of Cuttle's actions and inactions with respect to this loan, the Bank incurred in excess of $150,000 in losses.  Had Cuttle performed adequate due diligence and provided a complete

14

and accurate Loan Presentation, MHB would not have made the Bay Harbor loan to Delta and incurred the resulting losses.

### Green

42.     In June 2007, Cuttle originated and recommended the approval of a $950,000 loan to Green & I-96 Investment, LLC ("Green").  Cuttle's Loan Presentation represented that the purpose of the loan was to retire an existing land contract and that the primary source of repayment of the loan would be rental income from warehouse space.  The Loan Presentation also stated that the loan would be secured by a first mortgage on the collateral property that would be cross collateralized with collateral from another loan, and that the owner of Green would be the guarantor for the loan.  The value of the collateral identified in Cuttle's Loan Presentation was based, in part, on the borrower's statements to the appraiser regarding development costs that allegedly had already been invested in the collateral property.  These unverified development costs artificially inflated the purported value of the property, which caused the reported LTV ratio for the loan to fall within the limits established by MHB's Lending Policy.  Had Cuttle adequately reviewed the appraisal, he would have discovered that the appraiser had not confirmed the development costs reported by the borrower.  Further, had Cuttle reviewed the borrower's relevant financial statements, he would have discovered that the borrower represented the value of the property without development costs in its balance sheet and did not include any expenses for development costs on the income statement.  Moreover, the borrower signed an affidavit indicating he had not made any improvements on the property.  Prudent lending practices required Cuttle either to confirm the development costs or not to include them in his Loan Presentation.  If the development costs were excluded from the value of the collateral, the LTV ratio for the loan would have exceeded the limit established by MHB's

15

Loan Policy.  When Cuttle presented this loan to the SLC and recommended it for approval, he did not disclose his failure to verify the borrower's contradictory statements regarding the value of the collateral but, instead, simply presented the inflated valuation of the collateral for purposes of calculating the loan's LTV ratio.

43.     Cuttle violated the Bank's Lending Policy on this loan by, among other things: (1) failing to analyze and perform an independent review of the development costs for the property pledged as collateral, (2) failing to perform an independent and complete analysis of the financial creditworthiness of the borrower, and (3) ignoring the warning signs in the scant financial information he did obtain.  For example, the borrower's tax returns listed donations of a car and a van that were acquired the day before the donation and had a fair market value that exceeded the purchase price.  Further, the borrower listed in his tax return a donation in the form of a lease, which could be construed as a rent concession, and he listed a significant casualty loss without disclosing any of the required details.  All of these red flags were ignored by Cuttle and were never disclosed in his Loan Presentation.  Based on Cuttle's Loan Presentation and recommendation, the SLC approved the loan to Green on June 6, 2007, and MHB then funded the loan on or about July 30, 2007.

44.     On or about February 6, 2009, Green defaulted on the loan.  As a result of Cuttle's actions and inactions with respect to this loan, the Bank incurred in excess of $500,000 in losses.  Had Cuttle performed adequate due diligence and provided a complete and accurate Loan Presentation, MHB would not have made this loan to Green and incurred the resulting losses.

16

### Eight & Farmington

45.     In or about June 2007, Cuttle originated and recommended the approval of an $825,000 loan to Eight & Farmington Service, Inc. ("Eight & Farmington").  Cuttle's Loan Presentation stated that the purpose of this loan was to refinance an existing mortgage loan on a gas station and that the primary source of repayment of this loan would be the borrower's cash flow.  Cuttle's Loan Presentation also reported that the loan would be secured by a first mortgage on the gas station, which Cuttle represented as having a value of $1.18 million.

46.     Under MHB's Lending Policy, loans for properties with gas stations were classified as "undesirable" and the maximum LTV ratio for such a loan was 75 percent.  The original appraisal valued the collateral property at $1.18 million, which resulted in an LTV ratio for the loan of 69 percent.  However, the Bank's approved environmental appraiser reported that the property had environmental issues that would cost $150,000 to remediate and, thus, the appraised value of the property should be reduced accordingly, resulting in an appraised value of only $1.03 million and an increased LTV ratio of 80 percent, which exceeded the maximum LTV ratio under the Lending Policy.  Instead of seeking an exception to the Lending Policy, Cuttle hired a second environmental appraiser who was not on MHB's approved list and who opined that the environmental problems would cost only $10,000 to $15,000, rather than $150,000, to remediate.  Cuttle breached his duties to MHB by presenting only the favorable valuation of the collateral and failing to disclose the original environmental report, which rendered an LTV ratio that exceeded the limits established by MHB's Lending Policy, when he recommended this loan for approval.

47.     In addition to an inaccurate LTV ratio, Cuttle's Loan Presentation also included an inflated DSCR, which made the loan appear to have a DSCR in excess of the Lending

6980946.2 04649/136704

Policy's minimum ratio of 1.25. The actual DSCR for this loan was less than 1.0, indicating that the borrower could not produce enough cash flow to cover its debt payments. Thus, the loan was unacceptably risky and should not have been made under MHB's Lending Policy. Based on Cuttle's inaccurate Loan Presentation and recommendation, however, the SLC approved the loan to Eight & Farmington, which MHB then funded on or about October 17, 2007.

48.     On or about February 20, 2009, Eight & Farmington defaulted on this loan. As a result of Cuttle's actions and inactions with respect to this loan, the Bank incurred approximately $500,000 in losses. Had Cuttle performed adequate due diligence and provided a complete and accurate Loan Presentation, MHB would not have made this loan to Eight & Farmington and incurred the resulting losses.

### C.     Cuttle's Demotion

49.     Many of the loans that Cuttle originated and recommended became non-performing and went into default, including the loans described in this Complaint. In or about May 2007, MHB demoted Cuttle by removing him from the SLC and his position as Senior Loan Officer. Only one year later, in or about June 2008, Cuttle left the employment of MHB.

## V.     CAUSES OF ACTION

### COUNT I – NEGLIGENCE

50.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-49 above as if fully set out in this Count.

51.     As an officer of the Bank, at all times, Cuttle owed to MHB a duty to use reasonable care, skill, and diligence in the performance of his duties. This included, among other duties, conducting the business of MHB in a manner consistent with safe and sound lending practices, using reasonable and prudent procedures for underwriting loans, recommending

approval of loans in accordance with MHB's written Lending Policy, and providing the Board

and SLC with adequate, complete, and accurate information regarding all aspects of proposed

loans. This information included, among other things, the value and sufficiency of collateral, the

financial creditworthiness of the borrower, the LTV ratio, compliance with pre-funding

conditions, and any other information necessary to ensure that proposed loans complied with

MHB's Lending Policy and prudent lending practices. Cuttle was also responsible for ensuring

that loans closed according to the terms approved.

     **52.**     Cuttle was negligent by routinely and repeatedly failing to conduct and direct the

business and affairs of MHB in a manner consistent with safe and sound principles of banking.

Cuttle breached his duties and was negligent by, among other things:

     **A.**     Failing to follow reasonable, prudent, and non-negligent procedures for underwriting loans;

     **B.**     Causing MHB to approve and fund loans in violation of its Lending Policy and prudent lending practices;

     **C.**     Causing MHB to approve and fund loans based on inadequate collateral securing the loans;

     **D.**     Causing MHB to approve and fund loans based on inadequate, incomplete, inaccurate, or unrealistic appraisals of collateral;

     **E.**     Failing to adequately inspect real estate taken as collateral;

     **F.**     Causing MHB to approve and fund loans without requiring adequate sources of repayment;

     **G.**     Causing MHB to approve and fund loans without adequately analyzing DSCR values and borrowers' abilities to perform on the loans;

     **H.**     Failing to ensure that loans closed according to the terms approved;

     **I.**     Causing MHB to approve and fund unreasonably and imprudently structured loans; and

**J.**     Causing MHB to approve and fund CRE loans in which the
project equity contribution from the borrower was not evaluated or
was inadequate.

53.     As a direct and proximate result of Cuttle's negligence, Plaintiff suffered damages

in excess of $8.2 million.

## COUNT II – GROSS NEGLIGENCE

54.     Plaintiff re-alleges and incorporates by reference the allegations contained in

paragraphs 1-53 above as if fully set out in this Count.

55.     Under Michigan law and 12 U.S.C. § 1821(k), as an officer of the Bank, Cuttle

may be held personally liable for loss or damage to MHB caused by his gross negligence.

Michigan law defines gross negligence as conduct so reckless as to demonstrate a substantial

lack of concern for whether an injury results.

56.     As an officer of the Bank, at all times, Cuttle owed to MHB a duty to use

reasonable care, skill, and diligence in the performance of his duties.  This included, among other

duties, conducting the business of MHB in a manner consistent with safe and sound lending

practices, using reasonable and prudent procedures for underwriting loans, recommending

approval of loans in accordance with MHB's written Lending Policy, and providing the Board

and SLC with adequate, complete, and accurate information regarding all aspects of proposed

loans.  This information included, among other things, the value and sufficiency of collateral, the

financial creditworthiness of the borrower, the LTV ratio, compliance with pre-funding

conditions, and any other information necessary to ensure that proposed loans complied with

MHB's Lending Policy and prudent lending practices.  Cuttle was also responsible for ensuring

that loans closed according to the terms approved.

57.     Cuttle was grossly negligent by routinely and repeatedly failing to conduct and

direct the business and affairs of MHB in a manner consistent with safe and sound principles of

6980946.2 04649/136704

banking.  Cuttle was grossly negligent and acted with reckless disregard for whether he would injure MHB by, among other things:

        **A.**     Failing to follow reasonable, prudent, and non-negligent procedures for underwriting loans;

        **B.**     Causing MHB to approve and fund loans in violation of its Lending Policy and prudent lending practices;

        **C.**     Causing MHB to approve and fund loans based on inadequate collateral securing the loans;

        **D.**     Causing MHB to approve and fund loans based on inadequate, incomplete, inaccurate, or unrealistic appraisals of collateral;

        **E.**     Failing to adequately inspect real estate taken as collateral;

        **F.**     Causing MHB to approve and fund loans without requiring adequate sources of repayment;

        **G.**     Causing MHB to approve and fund loans without adequately analyzing DSCR values and borrowers' abilities to perform on the loans;

        **H.**     Failing to ensure that loans closed according to the terms approved;

        **I.**     Causing MHB to approve and fund unreasonably and imprudently structured loans; and

        **J.**     Causing MHB to approve and fund CRE loans in which the project equity contribution from the borrower was not evaluated or was inadequate.

     **58.**     As a direct and proximate result of Cuttle's gross negligence, Plaintiff suffered damages in excess of $8.2 million.

6980946.2 04649/136704

## COUNT III – BREACH OF FIDUCIARY DUTY

**59.**    Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-58 above as if fully set out in this Count.

**60.**    As an officer of the Bank, at all times, Cuttle owed to MHB a fiduciary duty to act in the best interests of the Bank, in good faith, and with the utmost care in the performance of his duties.  This included, among other duties, conducting the business of MHB in a manner consistent with safe and sound lending practices, using reasonable and prudent procedures for underwriting loans, recommending approval of loans in accordance with MHB's written Lending Policy, and providing the Board and SLC with adequate, complete, and accurate information regarding all aspects of proposed loans.  This information included, among other things, the value and sufficiency of collateral, the financial creditworthiness of the borrower, the LTV ratio, compliance with pre-funding conditions, and any other information necessary to ensure that proposed loans complied with MHB's Lending Policy and prudent lending practices.  Cuttle was also responsible for ensuring that loans closed according to the terms approved.

**61.**    Cuttle breached his fiduciary duties to the Bank by routinely and repeatedly failing to conduct and direct the business and affairs of MHB in a manner consistent with safe and sound principles of banking.  Cuttle breached his fiduciary duties by, among other things:

> **A.**    Failing to follow reasonable, prudent, and non-negligent procedures for underwriting loans;
>
> **B.**    Causing MHB to approve and fund loans in violation of its Lending Policy and prudent lending practices;
>
> **C.**    Causing MHB to approve and fund loans based on inadequate collateral securing the loans;
>
> **D.**    Causing MHB to approve and fund loans based on inadequate, incomplete, inaccurate, or unrealistic appraisals of collateral;

22

**E.**     Failing to adequately inspect real estate taken as collateral;

**F.**     Causing MHB to approve and fund loans without requiring adequate sources of repayment;

**G.**     Causing MHB to approve and fund loans without adequately analyzing DSCR values and borrowers' abilities to perform on the loans;

**H.**     Failing to ensure that loans closed according to the terms approved;

**I.**     Causing MHB to approve and fund unreasonably and imprudently structured loans; and

**J.**     Causing MHB to approve and fund CRE loans in which the project equity contribution from the borrower was not evaluated or was inadequate.

**62.**     As a direct and proximate result of Cuttle's breaches of fiduciary duty, Plaintiff suffered damages in excess of $8.2 million.

## VI.     <u>RELIEF REQUESTED</u>

WHEREFORE, the FDIC-R demands a trial by jury and judgment in its favor and against the Defendant as follows:

**A.**     Determining the amount of damages caused by Defendant;

**B.**     Determining the amount of accrued interest (including pre-judgment interest) on such damages;

**C.**     Awarding the FDIC-R the full amount thereof;

**D.**     Awarding the FDIC-R its costs and other expenses incurred by it in connection with this proceeding; and

**E.**     Granting the FDIC-R such other and further relief as this Court may deem just and proper under the circumstances.

6980946.2 04649/136704

## VII.    <u>JURY DEMAND</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the FDIC-R demands a trial by jury.

Respectfully submitted,

*/s/ Linda Watson*

David A. Breuch (P45368)
Linda Watson (P45320)
Clark Hill PLC
151 S. Old Woodward, Suite 200
Birmingham, MI  48009
(248) 988-5869
dbreuch@clarkhill.com
lwatson@clarkhill.com
Attorneys for Plaintiff

24